Joseph Pilchesky, Appellant *v.* Unemployment Compensation Board of Review of the Commonwealth of Pennsylvania, Appellee.

Argued February 4, 1977, before Judges CRUMLISH, JR., WILKINSON, JR. and MENCER, sitting as a panel of three.

*Richard A. Brown,* with him *Charles Witaconis* and *Ronald H. Skubecz,* for appellant.

*Daniel R. Schuckers,* Assistant Attorney General, with him *Sydney Reuben,* Assistant Attorney General, and *Robert P. Kane,* Attorney General, for appellee.

OPINION BY JUDGE WILKINSON, March 10, 1977:

According to the appellant's testimony the issue of whether his discharge from employment by the Department of Public Works of the City of Scranton was proper under the terms of the then union contract has been the subject of a grievance procedure resolved against him and in favor of the employer. The issue of whether his discharge was the result of insubordination, *i.e.,* failure to follow his orders, has been the subject of decisions by the Bureau of Employment Security, a referee, and the Unemployment Compensation Board of Review (Board) after a rehearing conducted by the referee then serving as the Board's Hearing Officer. All of these decisions have been in favor of the employer and against appellant. He appeals to this Court challenging the decision of the Board on two grounds:

I. Did the Unemployment Compensation Board of Review err as a matter of law in not requiring testimony essential to its determination of appellant's claim for benefits?

II. Did the Unemployment Compensation Board of Review err as a matter of law in determining that the conduct for which claimant

was discharged constituted 'willful misconduct'?

We affirm the Board's decision.

We will deal with the second issue first. This record is unusually extensive for this type of case. Appellant's testimony before the referee covers approximately 18 typed pages and approximately 10 typed pages at the rehearing before the Board Hearing Officer. The employer's testimony covers approximately three typed pages. We have read and reread the record in view of the serious charges appellant has leveled at all who take a position contrary to his in this matter. He accuses his union of conspiring with the employer against him and states that its officers "are the lowest that you can find in any union." He states that the employer's witness is a liar and that this witness falsified the employer's documents which are exhibits. He states that the referee's decision was not her own but of someone outside the referee's office.

The Board's Findings of Fact are both brief and specific:

1. The claimant was last employed by the City of Scranton, Department of Public Works, over four years. His last job was laborer in the Bureau of Highways, and he was paid at the rate of $3.70 an hour. His last day of work was in August 1974.

2. On August 6, 1973 the employer sent the claimant a written warning concerning absenteeism without notice to the employer.

3. On August 16, 1973 the employer sent the claimant a written warning and one-day suspension concerning absenteeism without notice to the employer.

4. On August 15, 1974 the employer sent and the claimant received a written warning

and three-day suspension 'for habitual absenteeism.

5. On August 21, 1974 the employer sent and the claimant received a written warning and a five-day suspension for habitual absenteeism.

6. On August 23, 1974 the employer sent and the claimant received a dismissal notice for insubordination in that the claimant failed to follow his orders.

In its discussion the Board states:

We find the testimony of the employer representative credible that the claimant was discharged for insubordination in that he failed to follow his employer's order.

If that were not sufficient, we can find adequate support for the Board's findings from the direct testimony of the appellant and the reasonable inferences to be drawn therefrom.

The appellant asserts "the real reason they fired me [was] because I was a radical on the job."[1] Again, "I took it upon myself to help out other employees when they were having trouble with the foreman." It is, therefore, not surprising when appellant states that he was warned repeatedly that he would be fired if "they" got a chance. Appellant testified that he was particularly dissatisfied with the transfers of men from the Bureau of Highways to the Bureau of Refuse and vice versa. He says this was done to cover up the misappropriation of funds by the head of the Department of Public Works. In some instances, appellant alleges, as an incident to the transfers, nonunion men were given jobs the appellant felt

---

[1] Appellant at one point testified that he was fired because he appeared before Council and "I let them have it with both barrels." In fact, this visit to Council clearly was well after appellant was discharged.

were properly jobs for union members and that the union acquiesced. "I started to scream about it." "I was suggesting everybody walk across the street, go on strike...." "Thirty of us were taken off refuse payroll to fit Jim McNulty's [head of the Department of Public Works] needs. He was running short of cash." Then comes the key question:

Q—Is that when you were transferred?

A—We were all transferred, thirty of us written over, yes.

It is this transfer which occurred during August 1974, that the employer asserts appellant refused to accept. He refused to accept the transfer by refusing to come to work. He was warned twice that this absenteeism was not condoned, but he continued his refusal to come to work in the transferred position, although, of course, the records of the Department of Public Works carried him as transferred.

Having thus postulated the position that justifies the conclusion that the burden of the employer to show that the appellant was disqualified was carried by the employee's own testimony of insubordination, we might well look at the appellant's explanation for his nonappearance to work in the transferred position. His first statement was that he was fired when he returned from one week suspension. In fact, the period of his suspension had never obtained. Further, incompatible with his learning that he was fired when he returned from one week suspension was his later testimony that he first learned that he was dismissed when he was at home and received the registered letter from the postman notifying him of his dismissal. His initial explanation was that he was staying home "chiefly" to take care of his wife and new born son. Indeed, he makes quite a point of the inhumanity of his superiors "to fire a guy right after his wife had a baby." On the other hand, he testified that "I was

out of work one full week before my wife had the baby.'' Finally, as a third incompatible explanation, he testified that he was ''very ill. I have over 300 allergies . . . I was ill from the allergies during the latter days of August.''

The other issue raised on appeal is that the actual individual who discharged appellant did not appear to testify. *Unemployment Compensation Board of Review v. Stiles*, 19 Pa. Commonwealth Ct. 38, 340 A.2d 594 (1975) is cited as controlling and requiring reversal. We disagree.

*Stiles* is like the instant case in that the actual individual representative of the employer best qualified to testify did not appear, but is unlike it in that here it is the testimony of the appellant himself that supplies the necessary basis to support the decision of the Board.

Accordingly, we will enter an order affirming the Board.

ORDER

Now, March 10, 1977, the order of the Unemployment Compensation Board of Review, decision number B-131067, issued April 20, 1976, is hereby affirmed.

